**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CRIMINAL CASE NO. |
| | : | 3:17-CR-214 |
| v. | : | |
| | : | |
| DEVELL CONLEY, | : | SEPTEMBER 20, 2018 |
| Defendant. | : | |

**RULING RE: MOTION TO SUPPRESS (DOC. NO. 49) AND SUPPLEMENTAL
MOTION TO SUPPRESS (DOC. NO. 76)**

## I.   INTRODUCTION

Pending before the court is defendant Devell Conley's Motion to Suppress (Doc.
No. 49) and Supplemental Motion to Suppress (Doc. No. 76).  Conley argues that the
Government violated his Fourth Amendment rights by (1) unlawfully stopping his vehicle
on May 18, 2017; (2) unlawfully arresting him without probable cause; (3) conducting an
unlawful search by calling a cell phone that was within the vehicle; (4) unlawfully seizing
three cell phones from the vehicle; (5) searching the cell phones pursuant to an invalid
warrant; (6) unlawfully entering and searching his residence without a warrant; and (7)
searching his residence pursuant to an invalid warrant.  See Motion to Suppress ("Mot.
to Suppress") (Doc. No. 49); Supplemental Motion to Suppress ("Suppl. Mot. to
Suppress") (Doc. No. 76).  On July 30, 2018, the court conducted an evidentiary hearing
on both Motions.

For the reasons stated below, Conley's Motion to Suppress is **DENIED**, and his
Supplemental Motion to Suppress is **DENIED**.

## II.    BACKGROUND

### A.    Hearing Testimony/Findings

The court held an evidentiary hearing on the Motion to Suppress on July 30, 2018.  See Minute Entry (Doc. No. 86).  At the hearing, the Government presented testimony from Detective Jeffrey Valiette of the East Haven Police Department, Officer Edrick Agosto of the New Haven Police Department, Task Force Officer Allyn Wright of the New Haven Police Department and the Drug Enforcement Administration ("DEA"), and Special Agent Dana Mofenson of the DEA.  Conley did not present any witnesses. The Government and the defendant each also introduced a number of exhibits.  See Proposed Exhibit List by USA (Doc. No. 83); Defendant's Proposed Exhibit List (Doc. No. 85); Defendant's Supplemental Exhibit List (Doc. No. 87).  In his Motions, Conley attacks the credibility of two of the Government's witnesses, Officer Wright and Detective Valiette.  The court summarizes the relevant testimony below.

Officer Wright testified at the hearing that, when he arrived at the scene where Conley's vehicle was stopped, Conley was already outside the vehicle.  Tr. (Doc. No. 88) at 115.  Conley introduced Officer Wright's grand jury testimony on September 20, 2017, at which Officer Wright did not include this detail.  Tr. at 115–17; Defense Ex. 2 at 45–48.  Officer Wright's grand jury testimony does not contradict his testimony at the hearing before this court, however; it merely omits a detail to which he testified here.

Additionally, Officer Wright testified at the hearing that Conley interacted with the driver of a green Subaru through the driver's side window.  Tr. at 118.  Conley introduced Officer Wright's grand jury testimony that he saw Conley approach the Subaru from the passenger side.  See Tr. at 118–19; Defense Ex. 2 at 45.  Officer Wright testified that the two statements were reconcilable, because he saw Conley

2

approach the Subaru from the passenger side of his field of view, continue around to the driver's side, and then conduct the transaction from the driver's side. Tr. at 118–19 Taken in context with the rest of Officer Wright's testimony and his presentation on the stand, the court concludes that neither of these statements undermines the credibility of Officer Wright's testimony.

Officer Valiette testified at the hearing before this court that he interviewed an individual ("Frequent Caller 1"), who stated that he or she knew the person who used the phone number at issue in Valiette's investigation. See Tr. at 32. Valiette testified that Frequent Caller 1 stated that he or she knew the person by the name of D.L., and that he or she knew D.L. to be a black male, 35 years old, operating a white Infiniti SUV. Tr. at 32–33. Valiette stated that Frequent Caller 1 said that he or she had met D.L. an hour before the interview and purchased heroin from D.L. Tr. at 32–33. Frequent Caller 1 added that he or she normally met D.L. at the intersection of Elliot Street and Sylvan Avenue. Tr. at 32.

Officer Valiette testified that he interviewed another individual ("Frequent Caller 2"), who stated that he or she met with a black male, known to them as D.L., who held the phone with the number at issue in the investigation. Tr. at 33. Detective Valiette added that Frequent Caller 2 stated he or she had recently purchased heroin from D.L. with the stamp "Griselda Blanco" on it. Tr. at 33.

Conley argues that Detective Valiette's statements were inconsistent with his report. Specifically, Conley contends that the report contains no "meaningful description" of the black male described. See Suppl. Mem. in Supp. of Def.'s Mot. to Suppress ("Suppl. Mem. in Supp.") (Doc. No. 76-1) at 12–13. Conley adds that the

3

report makes no note of a meeting between Frequent Caller 1 and D.L. that day. Id.

Finally, Conley argues that Detective Valiette's report contains "even less information"

as to Frequent Caller 2, and that the report was less detailed than Detective Valiette's

testimony. See id. at 13.

While there are inconsistencies between Detective Valiette's report and his

testimony before this court, the discrepancies are minor. The report states that

Frequent Caller 1 described the user of the phone number at issue as a drug dealer,

and as "a black male in his mid to early thirties," known to Frequent Caller 1 as D.L.,

who operates a white Infinity SUV to conduct his transactions at the intersection of

Sylvan Avenue and Elliot Street. See id. at 12–13.

The report states that Frequent Caller 2 identified the user of the phone number

at issue as a black male who went by the name D.L. Id. at 13. The report states that

Frequent Caller 2 met D.L. on Elliot Street in New Haven, and that Frequent Caller 2

had recently purchased heroin stamped "Griselda Blanca" from D.L. See id. at 13. The

report does not mention an earlier meeting between Frequent Caller 1 and D.L.

However, the remaining information in the report largely tracks Detective Valiette's

testimony at the hearing. After comparing Detective Valiette's testimony at the hearing

with his written report, the court finds that these minor inconsistencies did not

undermine Detective Valiette's credibility.

Ultimately, the court finds the Government's four witnesses to be credible, and

credits their testimony. While Conley noted minor inconsistencies in testimony, he did

not succeed in impeaching any of the four witnesses such that the court would discredit

4

their testimony.  The court finds no reason to discredit the witnesses based on their testimony and demeanor in court.

B.  Findings of Fact

The court finds the following facts.  On May 5, 2017, Detective Valiette responded to a scene where a suspected overdose victim, Christina Pace, was found deceased at the top of a stairway with a syringe in one hand.  On a table nearby, Detective Valiette found, inter alia, three unused heroin bags stamped "Griselda Blanco," which tested positive for fentanyl, a number of used heroin bags, and a cell phone.  See Gov't Exs. 1–6.

Detective Valiette seized the cell phone and searched it for evidence to identify the individual who sold the heroin to Ms. Pace.  Detective Valiette observed a number of text messages over several days to the same phone number (203-390-9948).  He believed the messages were arrangements for drug transactions.  See Gov't Exs. 8–21. The text messages included (1) references to requests for "two whole" or "one whole," which Detective Valiette understood, based on his experience, to refer to bundles of heroin; (2) quantities of 140 and 130, which Detective Valiette understood, based on his experience, to reflect the market price for two bundles of heroin; and (3) Elliot Street, which Detective Valiette understood in context to refer to the location of the transaction. See Gov't Exs. 8–21.

Detective Valiette then sought assistance from the DEA to access the toll records for the phone number, 203-390-9948 (hereinafter "Targeted Phone").  The DEA used a program to generate a call frequency list from the toll records, identifying phone numbers that frequently called the Targeted Phone.  See Gov't Ex. 22.  Detective Valiette ran the numbers on the call frequency list through Facebook in an effort to

determine the identities of the operators of any of the phones that frequently called the Targeted Phone.  On May 17, 2017, Detective Valiette learned the identities of two of the frequent callers on the list and interviewed those individuals.

Frequent Caller 1 stated that he or she had been in contact with the owner of the Targeted Phone for the purpose of purchasing heroin from that individual.  See Gov't Ex. 23 ¶ 21; see also Defense Ex. 5.  Frequent Caller 1 described the operator of the Targeted Phone ass "a black male, approximately 35 years old, who used the name D.L."  Id.  Frequent Caller 1 stated that he or she believed D.L. resided on Sylvan Avenue, near the intersection of Elliot Street, and he drove a white Infiniti SUV.  See id. Frequent Caller 1 then went with police to the intersection of Sylvan Avenue and Elliot Street and identified the location where D.L. frequently parked his white Infiniti SUV. See id.  The second individual, Frequent Caller 2, stated that he or she frequently purchased heroin from the operator of the Targeted Phone.  See id. ¶ 22; Defense Ex. 6.  Frequent Caller 2 described the operator of the Targeted Phone as a black male who used the name D.L.  See id.  Neither Frequent Caller 1 nor Frequent Caller 2 had worked with the police as an informant in the past.

Based on the information received from Frequent Caller 1 and Frequent Caller 2, Detective Valiette set up surveillance at the location of Elliot Street and Sylvan Avenue on May 17, 2017.  The surveillance team consisted of Detective Valiette and one other officer in one surveillance vehicle.  Detective Valiette observed a black male enter a white Infiniti SUV near the intersection and drive away.  While following the white Infiniti SUV, Detective Valiette observed this vehicle stop at a traffic light in a non-turning lane, then cut off another vehicle to make a right turn.  Detective Valiette testified that he

believed someone from the area who knew where they were going would not normally make a maneuver like that. The surveillance vehicle then followed the white Infiniti SUV onto the highway and the officers observed the SUV cross four lanes of traffic from the leftmost lane to make an exit. Detective Valiette testified that, based on his experience, he believed that the maneuver was an attempt to elude law enforcement. Detective Valiette terminated surveillance because he believed more than one vehicle would be needed to conduct surveillance.

On May 18, 2017, at 6:30 AM, officers from the New Haven Police Department and the DEA, including Officer Wright and Special Agent Mofenson, joined Detective Valiette to conduct surveillance at the same location on Elliot Street and Sylvan Avenue. They observed the SUV parked on Elliot Street facing Sylvan Avenue. A green Subaru pulled up at the corner in front of the SUV. Officer Wright observed a black male, later identified as Conley but unknown to the officers at the time, approach the green Subaru. Without engaging in conversation with the driver of the Subaru, Conley approached the driver's side window, reached his hand in, and then retreated from the vehicle. The green Subaru then pulled away. Officer Wright testified that the transaction took less than 25 seconds and that he believed the transaction was consistent with a hand-to-hand drug transaction.

Conley then entered the white Infiniti SUV, drove up Elliot Street, and took a right on Sylvan Avenue. A number of the surveillance vehicles, including Officer Wright's vehicle, followed the SUV. Officer Wright observed the SUV make several square turns, looping around the block several times. Officer Wright testified that, based on his experience, the maneuvers were consistent with measures to evade law enforcement.

7

The officers in the surveillance team issued a request to conduct a motor vehicle stop on the white Infiniti SUV.  In two separate marked patrol cars, Officer Agosto, Officer in Training Louis Rivera, and Detective Fred Salmeron of the New Haven Police Department responded to the request and stopped the SUV.  The officers were not aware of the reason for the stop or the identity of the driver.  Detective Salmeron approached the vehicle from the driver's side and spoke with Conley.  Officer Agosto approached from the passenger side and observed Conley lean over and reach his right arm toward the glove compartment.  He testified that, when Conley saw him, Conley returned to a seated position before again sliding over as if reaching for something.

After observing these motions, Officer Agosto walked to the driver's side of the vehicle, and either he or Detective Salmeron asked Conley to step out of the vehicle.  Conley exited the vehicle without resisting.  The officers did not use force to get him out of the vehicle.  Officer Agosto testified that he would have remembered if he or Detective Salmeron had used force because he would have had to file a report documenting the use of force and had not had to do so in this case.  The officers patted Conley down for weapons and found none.  Officer Agosto, Detective Salmeron, and Officer in Training Rivera then escorted Conley to the rear of the vehicle away from the glove compartment.  At the rear of the vehicle, they waited for the other units to arrive. The officers did not tell Conley that he was under arrest at the time, nor did they use handcuffs or draw their weapons.  In addition to Officer Agosto's testimony, Detective Valiette, Officer Wright, and Special Agent Mofenson all testified that, when they arrived on the scene, they observed that Conley was not in handcuffs and that no officers had their weapons drawn.

Special Agent Mofenson and Officer Wright arrived at the scene of the stopped vehicle approximately 30 seconds after Conley was escorted to the rear of the vehicle. Officer Wright observed through the driver's side window that three cell phones were located inside the door pocket on the driver's side. He informed Special Agent Mofenson, who then dialed the telephone number of the Targeted Phone. The officers then heard a phone ringing inside the vehicle. Officer Wright seized the three cell phones: the phone that was ringing, an Alcatel phone ("Cell Phone 1"); an Apple iPhone ("Cell Phone 2"); and a Kyocera cell phone ("Cell Phone 3"). Cell Phone 1 and Cell Phone 3 were both Android "smart phones." Gov't Post Hr'g Mem. (Doc. No. 89) at 2.

Special Agent Mofenson then directed that Conley be placed under arrest. Conley was placed in handcuffs and transported to the New Haven Police Department. Since his arrest, Conley has been incarcerated at Wyatt Detention Facility, which does not permit its inmates to possess cell phones. Special Agent Mofenson testified that he would have been the person to process a request for return of the cell phones, if any had been made, but that he did not receive any requests, from Conley or anyone else.

Following Conley's arrest, Special Agent Mofenson and Detective Valiette returned to the DEA office to process evidence and paperwork. Special Agent Mofenson authored an affidavit for a criminal complaint. See Gov't Ex. 23. Detective Valiette made a second call to the Targeted Phone and observed Cell Phone 1 ringing with his own phone number visible on the screen.

Special Agent Mofenson testified that, between May and June 2017, he continued to work on the case by processing paperwork and evidence, writing reports, and interviewing witnesses. He interviewed two other witnesses, including Robert

Stawarz, the owner of the white Infiniti SUV. He also was the case agent on 12 to 15 other overdose cases and was dealing with personal medical issues that had required three surgeries that year. He testified that he missed a total of 6-8 weeks of work because of the surgeries, and that the resulting backlog and his diminished health made his workload more challenging to complete.

On June 12, 2017, Special Agent Mofenson submitted three search warrant applications for Cell Phones 1, 2, and 3; Magistrate Judge Margolis signed the warrants. See Mot. to Suppress, Ex. C ("June Warrants"), at 56–90. A Task Force Officer ("TFO"), Michael Chaves, extracted the data from Cell Phone 3 on or about June 22, 2017, pursuant to the June Warrants. See Govt.'s Post Hr'g Mem. at 2. TFO Chaves provided the extracted data from Cell Phone 3 to Special Agent Mofenson, who conducted a search of the data. Id. at 2. TFO Chaves determined that the process to extract data from Cell Phone 1 might result in destruction of the cell phone, so he did not extract data pursuant to the June Warrants. Id. at 3.

On August 17, 2017, "believing that the June 12, 2017 warrants . . . may have expired" and after the Government conferred with defense counsel, Special Agent Mofenson submitted a new application for a search warrant as to Cell Phone 1; Magistrate Judge Margolis signed the warrant. Id. at 3–4; see id. Ex. 2 ("August Warrant"). TFO Chaves extracted data from Cell Phone 1, pursuant to the August Warrant, on or about August 21, 2017. Gov't.'s Post Hr'g Mem. at 4. TFO Chaves provided the extracted data from Cell Phone 1 to Special Agent Mofenson, who conducted a search of the data. Id. at 4. The contents of Cell Phone 2, the Apple iPhone, were not "dumped" because the technology to do so did not exist at the time.

As of the date of the hearing, the search warrant had not yet been executed on Cell Phone 2. Evidence obtained from Cell Phones 1 and 3 included text messages that the Government believes refer to drug transactions, contact information and names, and records of telephone calls.

## III.    DISCUSSION

Conley argues that the Government violated his Fourth Amendment rights with respect to the stop of his vehicle, his arrest, the seizure and search of each of the three cell phones, and two searches of his apartment. He seeks to suppress all of the evidence obtained from the vehicle stop, the cell phones, and the residence.

The Government represented at the evidentiary hearing that it does not intend to use the evidence seized from Conley's residence at trial. Therefore, to the extent that the Motion to Suppress addresses the searches of Conley's residence, based on the Government's representation, the Motion is denied as moot. The court addresses the remaining issues below.

### A.    Stop of Conley's Vehicle

On May 18, 2017, officers pulled Conley over while he was driving the white Infiniti SUV. Conley argues that he had a privacy interest in the vehicle, even though it was borrowed, because the vehicle's owner granted him permission to operate it. See Mot. to Suppress at 11–13. He argues that the officers lacked reasonable suspicion or probable cause[1] to stop his vehicle because (1) the information obtained from Frequent Caller 1 and Frequent Caller 2 were not specific enough to identify him; (2) his

───────────────

[1] To the extent that Conley's argument relies on probable cause, the court notes that Conley has employed the incorrect standard for a brief investigative stop of a vehicle: reasonable suspicion is the correct standard. See, e.g., United States v. Avizu, 534 U.S. 266, 273 (2002).

interaction with the Subaru and turns made while driving were not suspicious; (3) he did not violate any traffic laws; and, (4) the officers who conducted the stop did not know the reason for the stop. See id.; Suppl. Mem. in Supp. at 10–11. The Government does not dispute whether Conley had a privacy interest in the car, but argues that they had reasonable suspicion to stop the car based on facts known to them at the time of the stop. See Memorandum in Opposition to Motion to Suppress ("Mem. in Opp.") (Doc. No. 67) at 13–15.

Police may conduct a brief investigatory stop of a vehicle based on "reasonable suspicion to believe that criminal activity may be afoot." United States v. Avizu, 534 U.S. 266, 273 (2002) (internal quotation marks and citation omitted). Courts make reasonable suspicion determinations by looking at the "totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." Id. "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Id. at 274 (internal quotation marks and citation omitted). Ultimately, the court's inquiry is whether there are "specific and articulable facts which, taken together with rational inferences from those facts . . . provide detaining officers with a particularized and objective basis for suspecting wrongdoing." United States v. Bailey, 743 F.3d 322, 332 (2d Cir. 2014) (internal citations and quotations omitted).

In this case, the officers had reasonable suspicion to stop Conley's vehicle. The information provided by Frequent Caller 1 and Frequent Caller 2 gave officers reason to

believe that the driver of the white Infiniti SUV was involved in selling drugs related to the overdose death of Christina Pace. Neither Frequent Caller 1 nor Frequent Caller 2 were cooperating witnesses or informants with a history of working with the police. Nonetheless, considering the totality of the circumstances, the court finds that the information provided by Frequent Caller 1 and Frequent Caller 2 are sufficiently reliable to establish reasonable suspicion to stop the white Infiniti SUV. See Phaneuf v. Fraikin, 448 F.3d 591, 597 (2d Cir. 2006) ("The Supreme Court has instructed courts to evaluate informants' tips based on the 'totality of the circumstances,' while allowing for the 'lesser showing required' to meet the reasonable suspicion standard.").

Both Frequent Caller 1 and Frequent Caller 2 stated that the basis for their knowledge regarding the operator of the Targeted Phone was their own interaction with him. Second, they both stated that they purchased heroin from the operator of the Targeted Phone, which is a declaration against interest that reinforces the reliability of the information they provided. See United States v. Harris, 403 U.S. 573, 583 (1971) ("Admissions of crime . . . carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search.").

Moreover, police corroborated large portions of the Frequent Callers' statements. Decisions applying the totality of the circumstances test "have consistently recognized the value of corroboration of details of an informant's tip by independent police work." Illinois v. Gates, 462 U.S. 213, 241 (1983). In United States v. Walker, an anonymous telephone tip to police warned that a black man, approximately 5'8" to 5'9", approximately twenty-five years old, large and fat, clean-shaven and with close-cropped hair, would arrive in New York carrying automatic weapons. See United States v.

Walker, 7 F.3d 26, 27 (2d Cir. 1993). Police stopped a man who loosely fit the description—Walker was 5'11" tall, weighed 470 pounds, and had close-cropped hair and searched his briefcase, id. at 27, 28. The Second Circuit upheld the investigatory stop and search because while the anonymous call "provided few independent indicia of reliability . . . the police verified nearly every aspect of the tip." Id. at 31.

In this case, police independently corroborated significant portions of the Frequent Callers' statements. In particular, the information regarding the location and description of the white Infiniti SUV, as well as the physical description of D.L., was independently corroborated by police investigation after conducting surveillance of the identified intersection. Moreover, unlike in Walker, Frequent Caller 1 and Frequent Caller 2 spoke to investigators face-to-face, lending their statements greater credibility. See United States v. Salazar, 945 F.2d 47, 50-51 (2d Cir. 1991) (holding that though officers had not previously relied on informant, face-to-face informant was as a general matter more reliable than an anonymous telephone tipster).

Additionally, the information from the Frequent Callers was not the only basis for the officers' reasonable suspicion for the stop. On the evening of May 17, 2017, Detective Valiette observed the operator of the white Infiniti SUV engage in manuevers that he believed, based on his experience, to be attempts to evade law enforcement. On the morning of May 18, 2017, Officer Wright observed the SUV make several square turns around the block, which he similarly believed were counter surveillance measures. Officer Wright observed Conley approach the driver's side of a green Subaru, reach his arm in without conversation, and quickly retreat while the Subaru drove away. He testified that, based on his experience, he believed the activity to be consistent with a

hand-to-hand drug transaction.  Officer Wright did not see drugs pass between Conley and the driver of the vehicle.  However, the standard for an investigatory stop of a vehicle requires reasonable suspicion, not probable cause or a preponderance of the evidence.  See Avizu, 534 U.S. at 273.  The court concludes that, taken together, the above evidence, known to the officers that requested the vehicle stop, was sufficient to establish reasonable suspicion to believe that the driver of the white Infiniti SUV was involved in criminal activity and to order a vehicle stop.

As to Conley's argument that the stop was unlawful because the officers who conducted the stop, Officer Agosto and Detective Salmeron, did not know the reason for the stop, the argument is unavailing.  The Second Circuit has held that, under the collective knowledge doctrine "an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation."  United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001).  The collective knowledge doctrine exists "because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates."  Id. (quoting United States v. Valez, 796 F.2d 24, 28 (2d Cir. 1986)).  Here, the surveillance team had reasonable suspicion to stop the Infiniti SUV; under the collective knowledge doctrine, their knowledge is imputed to the officers who conducted the investigatory stop.

Accordingly, the Motion to Suppress is denied on this ground.

B.    Arrest of Conley

After Officer Agosto, Detective Salmeron, and Officer in Training Rivera stopped Conley's vehicle, they ordered him out of the vehicle and escorted him to the rear of the car.  See Mot. to Suppress at 13–14 (describing Conley as "secured" at the rear of the vehicle).  While Conley was at the rear of the vehicle, Special Agent Mofenson called the Targeted Phone, and the officers heard ringing from inside the vehicle.  Officer Wright seized the three cell phones.  Special Agent Mofenson then ordered Conley arrested, at which time he was told that he was under arrest and was handcuffed.

Conley argues that, even if the encounter began as a brief investigatory stop, it became an arrest when he was "secured" at the rear of the vehicle.  See Mot. to Suppress at 13–14.  He argues that the facts known to the officers at the time were insufficient to establish probable cause for the arrest and seeks to have nearly all of the Government's physical evidence suppressed as a result.  See id.  The Government argues that Conley was not arrested when he was escorted to the rear of the vehicle, but only when Special Agent Mofenson ordered Conley placed under arrest after officers heard ringing from inside the vehicle.  The Government argues that the facts known at the time Special Agent Mofenson ordered Conley's arrest were sufficient to establish probable cause to arrest Conley.  See Mem. in Opp. at 15–16.

The court considers first whether officers arrested Conley when he was escorted to the rear of the vehicle or whether Conley was arrested later, when Special Agent Mofenson ordered him placed under arrest.  The court then proceeds to consider whether there was probable cause for the arrest at that time.

An encounter that began as a Terry stop requiring only reasonable suspicion may become an arrest requiring probable cause "[i]f the totality of the circumstances

16

indicates that an encounter has become too intrusive to be classified as an investigative detention." Posr v. Doherty, 944 F.2d 91, 98 (2d Cir. 1991); see also United States v. Perea, 986 F.2d 633, 644 (2d Cir. 1993) ("[A]n encounter that began as a permissible Terry stop may have ripened into an arrest, which must be supported by probable cause, if, for example, the officers unreasonably used means of detention that were more intrusive than necessary."). In determining whether the means were too intrusive, the Second Circuit has considered a number of factors, including (1) the amount of force used by police; (2) the need for such force; (3) the extent to which the individual's freedom was restrained; (4) the number of agents involved; (5) whether the target of the stop was suspected of being armed; (6) the duration of the stop; and (7) the physical treatment of the suspect, including whether or not handcuffs were used. Parea, 986 F.2d at 645.

In this case, Conley did not resist the order to exit the vehicle. The officers did not use force to get Conley to exit the vehicle. Nor did they use force when escorting Conley to the rear of the vehicle or while waiting at the rear of the vehicle for other units to arrive. Officer Agosto testified that he observed Conley appear to be reaching for something in the glove compartment; thus, his reason for requesting Conley to exit the vehicle was officer safety. At the time officers took Conley to the rear of the vehicle, three officers were present at the scene. More officers arrived afterwards, including Special Agent Mofenson, Officer Wright, and Detective Valiette. The testimony indicates that eventually there were at least three, possibly more, police vehicles, both marked and unmarked, at the stop. Conley was "secured" at the rear of the vehicle by the presence of the three officers watching him. The officers testified that they neither

drew their weapons nor placed Conley in handcuffs when he was taken to the rear of the vehicle. Officers handcuffed Conley only after Special Agent Mofenson later ordered Conley arrested. Finally, the investigatory stop in this case was very brief. Special Agent Mofenson and Officer Wright arrived within a minute after of Conley being escorted to the rear of the vehicle.

Considering these factors, the court concludes that the stop did not become an arrest when Conley was held at the rear of the vehicle. "[A] police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle." Maryland v. Wilson, 519 U.S. 408, 410 (1997); United States v. Castillo, No. 00 CR. 549(LMM), 2002 WL 999279, at *4 (S.D.N.Y. May 15, 2002). In most cases where the court has found that the officers' approaches to automobiles have been "so intrusive as to constitute or be tantamount to arrests," the officers have had their guns drawn or used some other form of restraint. See United States v. Ceballos, 654 F.2d 177, 181 & n.7 (2d Cir. 1981) (citing cases); Castillo, 2002 WL 999279, at *4 (finding means of detention was not more intrusive than necessary, and that the stop did not become arrest, where four officers at the scene did not draw their weapons); cf. United States v. Jackson, 652 F.2d 244, 249 (2d Cir. 1981) (holding that stop did not become arrest where officer had drawn his weapon, but did not point it at the defendant). While there is little doubt that as the number of armed officers at a stop increases, so too does the likelihood that an investigative stop will develop into an arrest, the mere presence of more than one officer during an investigatory stop is not sufficient to reach such a conclusion. See, e.g., United States v. Vargas, 369 F.3d 98, 100–02 (2d Cir. 2004) (holding that investigatory stop did not ripen into arrest when at least four officers

conducted investigatory stop, suspect fled, officers chased suspect, placed him on ground, and handcuffed him).  In this case, the officers did not use force or handcuff Conley, and the investigative stop was limited to the brief time needed for the officers who requested the stop to arrive on scene.  Therefore, despite the number of vehicles and officers on the scene, the court concludes that the means of detention were not more intrusive than necessary under the circumstances.

The court concludes that officers did not arrest Conley when they secured him at the rear of the vehicle.  Rather, as the Government argues, officers arrested Conley when Special Agent Mofenson, after calling the Targeted Phone and hearing a phone ring inside the vehicle, ordered Conley arrested.

The court proceeds to consider whether the arrest, conducted without a warrant, was lawful.  An officer may make a warrantless arrest where there is probable cause to believe a crime has been or is being committed.  Devenpeck v. Alford, 543 U.S. 146, 152 (2004).  "An officer has probable cause to arrest when he or she has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'"  Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir. 2006) (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).  The probable-cause standard is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  United States v. Delossantos, 536 F.3d 155, 159 (2d Cir. 2008) (quoting Maryland v. Pringle, 540 U.S. 366, 370 (2003)).  The court determines

probable cause based upon the "reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  Devenpeck, 543 U.S. at 152.

In addition to the facts the court considered in determining whether the officers had reasonable suspicion to stop the white Infiniti SUV, by the time of the arrest, the officers additionally had knowledge of the fact that the Targeted Phone was present in the driver's side door pocket of the SUV Conley had been driving.  Officers knew that the phone number was associated with text messages to the deceased overdose victim that contained evidence of arrangements for a number of drug transactions, including one just before her death.  Although Conley argues that the officers could not be certain that Conley owned or used the phone, given the phone's location in the car next to Conley—who was the only individual in the car at the time—the facts were sufficient to warrant a reasonable belief that Conley was the operator of the Targeted Phone and had committed a crime.  Therefore, the court concludes that officers had probable cause to arrest Conley.

Accordingly, the Motion to Suppress on this ground is denied.

C.    Call to Cell Phone 1

While Conley was secured at the rear of the vehicle, prior to his arrest, officers called the Targeted Phone, the phone with which the deceased overdose victim had communicated.  Cell Phone 1 was heard ringing inside the driver's side door pocket, and officers seized the ringing cell phone (Cell Phone 1), as well as Cell Phones 2 and 3, which were in the same location.

Conley argues that calling the phone number was a search, triggering Fourth Amendment protections.  See Suppl. Mot. to Suppress at 8–12.  He argues that officers placed the call without a warrant or exigent circumstances.  See id.  The Government

argues that calling the phone number was not a search and, therefore, that the Fourth Amendment does not apply.  See Memorandum in Opposition to Suppl. Mot. to Suppress ("Mem. in Opp. Suppl.") (Doc. No. 80) at 2–4.

Fourth Amendment protections attach only when a "search" has occurred, i.e. when the government has intruded on an individual's reasonable expectation of privacy. See Katz v. U.S., 389 U.S. 347, 360–62 (1967) (Harlan, J., concurring).  Although the Supreme Court has held that individuals have a reasonable expectation of privacy in the contents of a cell phone, see Riley v. California, 134 S. Ct. 2473, 2494–95 (2014), neither the Supreme Court nor the Second Circuit has addressed whether a search occurs when an officer calls a known telephone number and observes the defendant's phone ring.

The only district court in this Circuit to consider the question held that the officer did not search the defendant's cell phone when he called the number using his own cell phone and observed the defendant's phone ringing.  See United States v. Pacheco, 2015 WL 3402832, at *7 (W.D.N.Y. 2015).  Conley attempts to distinguish Pacheco by arguing that, in contrast to making a call in a public place, the officers here could not have heard the phone ringing if officers had not stopped the vehicle.  See Suppl. Mot. to Suppress at 8–12.  However, the court has held that the officers lawfully stopped Conley's vehicle and therefore were legally present next to the vehicle when they heard the phone ringing.  Additionally, Officer Wright's testimony revealed that the cell phones were in the door pocket on the driver's side, in plain view of Officer Wright.

A number of courts have reached the same conclusion as Pacheco.  See United States v. Lawing, 703 F.3d 229, 238 (4th Cir. 2012); United States v. Chambers, No.

15-59-GMS, 2017 WL 4005641, at *7 (D. Del. Sept. 12, 2017); <u>United States v. Nguyen</u>,
No. 3:14-CR-00063-SLG, 2015 WL 685859, at *4 (D. Alaska Feb. 18, 2015); <u>United
States v. Pineda-Areola</u>, No. 4:07-CR-0007-5-DFH-MGN, 2008 WL 12664, at *4 (S.D.
Ind. Jan. 10, 2008) ("Dialing the telephone number was not a search within the meaning
of the Fourth Amendment and did not invade any protected privacy interest."); <u>Com. v.
Terry</u>, No. 0156-02-2, 2002 WL 1163449, at *1–*2 (Va. Ct. App. June 4, 2002) (stating
that dialing the telephone number did not require any "sense enhancing technology not
in 'general public use'" and that "the officer was permitted to use his sense of hearing
under the plain view doctrine" to hear the sound of the phone ringing).

In one case, the district court for the Eastern District of Pennsylvania held that a
search had occurred when the officers told the defendant to produce his cell phone, the
defendant placed the cell phone on the dashboard, and then the officer dialed the
phone and observed it vibrating. <u>See</u> <u>United States v. Claude</u>, No. CRIM.A. 12-33,
2013 WL 210249, at *4–*6 (E.D. Pa. Jan. 16, 2013). In that case, however, the court
focused on the fact that the officers temporarily seized the cell phone by ordering the
defendant to produce it. <u>See</u> <u>id.</u> In the case before this court, the cell phones were in
plain view in the door pocket on the driver's side, and Special Agent Mofenson did not
order Conley to produce the phone before calling the phone number. Therefore, the
<u>Claude</u> decision is distinguishable, and this case is more comparable to the <u>Lawing</u>
decision, in which that court held that no search had occurred.

Consistent with the persuasive authority from these other courts, the court holds
that Special Agent Mofenson did not conduct a "search" within the meaning of the
Fourth Amendment when he called the Targeted Phone and heard the phone ringing

inside the car.  Because the call was not a search, the Fourth Amendment's protections do not apply.  Therefore, the Motion to Suppress on this ground is denied.

> D.      Search of the Vehicle and Seizure of Cell Phones 1, 2, and 3

After the officers heard Cell Phone 1 ringing inside the driver's side door, Officer Wright seized all three cell phones.  Conley argues that this search of the vehicle and seizure of the cell phones was unlawful because the officers did not have probable cause to seize any of the three cell phones.  See Suppl. Mot. to Suppress at 6–8; Mot. to Suppress at 20.  He argues that merely having multiple cell phones is not evidence that they are associated with a crime and, further, that the officers had no evidence that the phones belonged to or were used by Conley.  See id.  More specifically, as to Phones 3, Conley argues that the officers did not have probable cause to seize the phone because they had "no evidence to suggest that [Cell Phone 3 was] involved in drug trafficking."  Suppl. Memo in Supp. at 9.

The Fourth Amendment generally requires police to obtain a warrant before conducting a search.  However, "there is a well-established exception for vehicle searches.  If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."  United States v. Jones, 893 F.3d 66, 70 (2d Cir. 2018) (quotations and citations omitted).  "Where law enforcement authorities have probable cause to believe a container holds contraband or evidence of a crime, but have not secured a warrant, the [Supreme Court] has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if . . . [a] recognized exception to the warrant requirements is present."  United States v. Martin, 157 F.3d 46, 53 (2d Cir. 1998) (quotation omitted)); see also United States v. Mayo, No. 2:13-CR-48,

2013 U.S. Dist. LEXIS 158866, at *43-44 (D. Vt. Nov. 6, 2013) (holding that while cell phones seized incident to the automobile exception cannot be searched without a warrant, the bar on a warrantless search "has no bearing on whether the seizure of cell phones . . . under the automobile exception is constitutional").  Therefore, the question at the time of the seizure is whether the officers had probable cause to believe that the cell phones contained evidence of a crime.

The court analyzes Cell Phone 1 separately from Cell Phone 3.  As to Cell Phone 1, there were sufficient facts for officers to believe that Cell Phone 1, which is the Targeted Phone, was involved in arranging drug transactions with the deceased overdose victim.  After Special Agent Mofenson dialed the Targeted Phone, the officers immediately heard ringing inside the car, and Officer Wright observed that Cell Phone 1 was the phone that was ringing.  The immediate, audible ringing in response to Special Agent Mofenson's call would be sufficient for a reasonable officer to believe that Cell Phone 1 was the phone used to arrange drug transactions with the victim.  Therefore, the court concludes that officers had probable cause to believe that Cell Phone 1 contained evidence of drug trafficking.  The Motion to Suppress is denied as to Cell Phone 1 on this ground.

Though a closer call, the court finds that the facts were sufficient to establish probable cause to seize Cell Phone 3.  The court notes at the outset that a person's mere ownership or possession of multiple cell phones does not give law enforcement probable cause to seize property.  See United States v. Irizarry, 509 F. Supp. 2d 198, 209 (E.D.N.Y. 2007) ("The widespread and lawful presence of an item in society undercuts the reasonableness of an officer's belief that it represents contraband.");

United States v. Romy, No. 96-CR-607 (JG), 1997 WL 1048901, at *8 (E.D.N.Y. Apr. 24, 1997) (rejecting argument that "mere possession of cellular phones provides probable cause to believe [the defendant] had committed a crime or even reasonable suspicion that he might have").  Here, however, the Government presented evidence beyond possession of three cell phones.

Special Agent Mofenson testified that, based on his experience, it is common for drug traffickers to have multiple phones because it helps them avoid detection by law enforcement.  Although the officers did not have information indicating that Cell Phone 3 was used in drug trafficking, they did have information that Cell Phone 1 was used in drug trafficking, and Cell Phone 3 was found in the same car door pocket as Cell Phone 1.  Additionally, officers found the cell phones in the door next to Conley, who was the sole occupant of the vehicle.  Moreover, Conley fit the description of the man from whom Frequent Caller 1 and Frequent Caller 2 claim to have purchased drugs, was driving a vehicle that matched the description Frequent Caller 1 and Frequent Caller 2 gave to investigators, and was on the street the Callers claimed the drug dealer, D.L., frequented.  Finally, officers had observed Conley making evasive maneuvers in the vehicle and interacting with the green Subaru in a manner consistent with a hand-to-hand drug transaction.  Considering all of these facts together, the court concludes that officers had probable cause to believe that Cell Phone 3, like Cell Phone 1, contained evidence of the crime of drug trafficking.[2]  Therefore, the Motion to Suppress is denied as to Cell Phone 3 on this ground.

_____

[2] When asked at the evidentiary hearing why the officers lacked probable cause to seize Cell Phones 2 and 3, defense counsel repeatedly pointed to the "taint" of the stop, Conley's arrest, and the

E.    Searches of Cell Phones 1, and 3

On June 12, 2017, Special Agent Mofenson sought and obtained from Magistrate Judge Margolis a search warrant to search the contents of Cell Phones 1, 2, and 3. Conley challenges the search warrant on two grounds. First, Conley argues that Special Agent Mofenson unreasonably delayed in seeking the warrant. See Mot. to Suppress at 21–22; Suppl. Mot. to Suppress at 7–8. Second, Conley argues that the warrant was impermissibly broad because it authorized a search of the entire contents of all three cell phones. See Mot. to Suppress at 22–23. In response Government argues that Conley lacks standing to challenge the search of the cell phones. See Gov't.'s Post Hr'g Mem. at 5–6. Although the parties blend the issues of particularity and overbreadth in this second issue, the court addresses each requirement separately.

1.    Conley's Standing to Challenge the Searches

The Government argued for the first time in its Post Hearing Memorandum that Conley failed to meet his burden to prove Fourth Amendment standing to challenge the searches of the cell phones. See id. The Government argues that Conley provided "no assertions whatsoever regarding his ownership of or legitimate expectations of privacy in, the cellular telephones seized from the vehicle he was operating prior to his arrest."

---

dialing of Cell Phone 1. However, the court has determined that the stop, the arrest, and the call were all lawful. Therefore, they cannot serve as the basis for invalidating the seizure of the cell phones.

Defense counsel also repeatedly claimed that the officers did not know anything "certain" about Cell Phones 2 and 3. The standard for a lawful seizure, however, is not certainty, but probable cause. Therefore, the officers did not need to know for "certain" that Cell Phones 2 and 3 contained evidence of a crime. They only needed probable cause to believe that these two phones contained such evidence. As stated above, the court finds that the totality of the facts known to the officers at the time was sufficient to establish such probable cause.

Id. at 6.  Conley contends that he has a reasonable expectation of privacy sufficient to establish Fourth Amendment standing to challenge the searches of the phones.

"Fourth Amendment rights are personal rights . . . [that] may not be vicariously asserted."  United States v. Haqq, 278 F.3d 44, 47 (2d Cir. 2002) (quoting Rakas v. Illinois, 439 U.S. 128, 133-34 (1978)).  A defendant's Fourth Amendment rights are therefore violated "only when the challenged conduct invaded his legitimate expectation of privacy rather than that of a third party." Id. (citation omitted).

In his Reply to the Government's Post Hearing Memorandum, Conley argues that his reasonable expectation of privacy in the cell phones derives from his expectation of privacy in the vehicle he was driving at the time of his arrest.  See Def.'s Reply to Gov't Post Hr'g Mem. at 4–5.  While Conley's expectation of privacy in a legitimately borrowed vehicle is sufficient to challenge the search of the vehicle, it is not, without more, adequate for him to challenge the separate search warrants for the cell phones seized from that vehicle pursuant to the automobile exception.  However, Conley submitted an affidavit swearing to his ownership of the cell phones seized on May 18, 2017.  See id. Attach. A.  The court finds that Conley's ownership interest in the cell phones is a sufficient basis for him to contest the legality of the resulting searches.

### 2.    Unreasonable Delay

A search, though based on probable cause, is unconstitutional if police act with unreasonable delay in securing a warrant.  Martin, 157 F.3d at 54.  The Second Circuit has considered the following factors in determining the reasonableness of a delay: "the length of time for which the individual was deprived of her or his property, any diminished interest in the property that the individual may have had, and whether the

seizure affected the individual's liberty interests, for example, where an officer seizes a traveler's luggage and thereby disrupts that individual's travel plans." United States v. Howe, 545 Fed. App'x 64, 65–66 (2d Cir. 2013). "The court also analyzes the government's interests in seizing the property, and balances the competing interests." Id. at 66.

In this case, the length of time during which Conley was deprived of his property, especially in light of the later August Warrant, weighs in Conley's favor. Special Agent Mofenson delayed for 25 days, from May 18, 2017 to June 12, 2017, in seeking the first search warrant. He delayed a further 66 days in seeking the August Warrant. See Gov't.'s Post Hr'g Mem. at 3. The court finds that the initial 25-day delay in seeking the June Warrants was reasonable. Special Agent Mofenson testified that, following Conley's arrest, he continued to work on the case by processing paperwork and evidence, writing reports, and interviewing two other witnesses.

Courts have found similar and even longer delays to be reasonable where, as here, the Government had a legitimate basis for the delay. Compare Martin, 157 F.3d at 54 (finding a delay of 11 days, including two weekends and a Christmas holiday, to not be unreasonable); United States v. Mathews, No. 18-CR-124 (JPO), 2018 WL 2277839, at *3–*4 & n.2 (S.D.N.Y. May 17, 2018) (finding a delay of 15 or 17 days to not be unreasonable); Howe, 545 Fed. App'x at 65–66 (describing a delay of 13 months to be "quite lengthy," but not constitutionally unreasonable under the circumstances), with United States v. Civil, No. 4:17CR19-MW-CAS, 2017 WL 4708063, at *3–*4 (N.D. Fla. Aug. 1, 2017) (holding a 25-day delay to be unreasonable where the special agent stated that "he had no idea what led to the delay in obtaining a warrant"). Based on the

circumstances in this case, the court finds that the delay in seeking the June Warrants was not unreasonable.

The additional 66-day delay in seeking the August Warrant, however, is harder for the Government to explain. The Government stated in its Post Hearing Memorandum that Special Agent Mofenson sought the August Warrant because he believed the June Warrant might have expired. See Gov't.'s Post Hr'g Mem. at 3. The Government further argued in its Reply to the Defendant's Reply to the Government's Post-Hearing Memorandum ("Gov't's Reply to Def.'s Reply") (Doc. No. 101) that the delay was reasonable because "when it was determined that extraction of data from [Cell Phone 1] would likely destroy the device, the Government invited defense counsel to observe the extraction process." Gov't Reply to Def. Reply at 3. The Government argued that Conley failed to explain "how attempting to accommodate defense counsel . . . should be weighed against the Government." Id. However, the Government failed to provide an adequate explanation of how inviting defense counsel to observe an extraction of data, standing alone, accounts for the Government's two-month delay in seeking a search warrant. As to the August Warrant, the court therefore concludes that the length of deprivation weighs in Conley's favor.

However, the remaining factors weigh in the Government's favor. In at least two cases, taking into account the preceding factors, courts have held that deprivation of a cell phone or a laptop has little or no effect on an individual's liberty interests. See Howe, 545 Fed. App'x at 66 ("[T]he seizure of the laptop did not restrain Howe's liberty interests."); Mathews, 2018 WL 2277839, at *3 ("[S]eizure of the cell phone had little or no impact on Defendant's liberty interests."). Conley argues that the seizure of a cell

phone infringes on his liberty interests because of the amount of data contained on the phones. However, he cites no case that has found such a liberty interest in a cell phone or a laptop. On the other hand, the government had a "legitimate interest in holding the property as evidence" because the officers were investigating drug trafficking involved in an overdose death—"unlawful conduct that the Government had a significant interest in investigating and preventing." United States v. Brantley, No. 1:17-CR-77-WSD, 2017 WL 5988833, at *2 (N.D. Ga. Dec. 4, 2017); see also Howe, 545 Fed. App'x at 66 (holding that the government had a "strong interest in retaining the laptop and not returning it to Howe" because it contained evidence of child pornography).

Additionally, Conley had a diminished possessory interest in the cell phone because Conley was detained at Wyatt Detention Facility following the arrest, and Wyatt does not permit its inmates to possess cell phones. See United States v. Johnson, 875 F.3d 1265, 1276 (9th Cir. 2017) ("Johnson had reduced privacy interests in his phone given his parolee status . . . ."); United States v. Shaw, 531 Fed. App'x 946, 949 (11th Cir. 2013); United States v. Hernandez Miranda, No. CR 16-200-GW, 2018 WL 582575, at *8 (C.D. Cal. Jan. 25, 2018); Brantley, 2017 WL 5988833, at *2 ("Brantley, having been arrested and detained, was not deprived of access to and use of the seized cellular telephones, because he was in custody, and he does not contend he was allowed possession of a cell phone while detained."); United States v. Kowalczyk, No. CRIM. 3:08-95-KI, 2012 WL 3201975, at *23 (D. Or. Aug. 3, 2012) ("[S]ince Kowalczyk was in custody, there was no evidence that withholding access to his computers and other digital evidence was prejudicial; he had no serious possessory interest at stake.").

Furthermore, neither Conley nor anyone else has requested the return of any of the cell phones, either during the delay or at any time prior to the evidentiary hearing. See Johnson, 875 F.3d at 1276; Hernandez Miranda, 2018 WL 582575, at *8; Brantley, 2017 WL 5988833, at *3 ("The failure to make a request for return of the cellular phones during the period of delay undermines Defendant's claim that his Fourth Amendment rights were impacted."). Special Agent Mofenson testified that requests for the return of the cell phones would have been made to him, and that he received no such requests. Conley has not disputed this fact or introduced any evidence that he made a request for the return of the phones.

While the length of deprivation as it relates to the August Warrant weighs in Conley's favor, the court finds that the remaining factors, including Conley's diminished interest in the property, the limited impact on his liberty interests, and the Government's interest in seizing and searching the phones, weigh in favor of the Government. The court concludes that the Government's delay in seeking the June and August Warrants was not unreasonable. Accordingly, the Motion to Suppress on this ground is denied.

3. Particularity

The Fourth Amendment requires that a warrant set out the scope of the authorized search with particularity. See United States v. Galpin, 720 F.3d 436, 445 (2d Cir. 2013). This requirement has three components. "First, a warrant must identify the specific offense for which the police have established probable cause. Second, a warrant must describe the place to be searched. Third, the warrant must specify the 'items to be seized by their relation to designated crimes." Id. at 445–46. The particularity requirement ensures that a warrant is sufficiently specific so that it does not "leave to the unguided discretion of the officers executing the warrant the decision as to

what items may be seized." <u>United States v. Wey</u>, 256 F. Supp. 3d 355, 380 (S.D.N.Y. 2017) (quoting <u>United States v. Zemlyansky</u>, 945 F.Supp.2d 438, 453 (S.D.N.Y. 2013)). The particularity requirement "assumes greater importance" where the property to be searched is a hard drive. <u>Galpin</u>, 720 F.3d at 446. This is because "[t]he potential for privacy violations occasioned by an unbridled, exploratory search of a hard drive is enormous," and there is "a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant." <u>Id.</u> at 447 (internal quotation and citation omitted).

The Government cannot cure a defective warrant by pointing to a warrant application or affidavit that has not been attached to or incorporated by the warrant. <u>See</u> <u>Groh v. Ramirez</u>, 540 U.S. 551, 557 (2004) ("The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents.") A court may look at a supporting document, such as the warrant application or affidavit, "if the warrant uses appropriate words of incorporation and if the supporting document accompanies the warrant." <u>In re 650 Fifth Ave. & Related Properties</u>, 830 F.3d 66, 99– 100 (2d Cir. 2016). In order for the warrant to "incorporate" the supporting document, the warrant must contain "deliberate and unequivocal language of incorporation"; it is not sufficient for the language in the warrant to reference the underlying document. <u>Id.</u>

Conley argues that the warrants were insufficiently particular. The Government did not seriously contest that the warrants were sufficiently particular, focusing their briefing instead on the good-faith exception. <u>See</u> <u>infra</u> at 36. The court examines the particularity of the June and August Warrants separately, below.

The June Warrants fall far short of the level of particularity the Fourth Amendment's requires. Specifically, the Warrants fail to specify with any level of particularity the type of evidence sought. See Groh, 540 U.S. at 557–58. Instructions on the face of each warrant state: "The person or property to be searched, described above, is believed to conceal (identify the person or describe the property to be seized)." See Mot. to Suppress Ex. C (emphasis in original). In the case of each warrant, however, the instructions are followed by a blank space. Id. While the warrant applications reference Attachment A, which is a list of the evidence sought, none of the June Warrants incorporate Attachment A, nor do they incorporate Agent Mofenson's Affidavit. See id. As the court has noted, the government cannot cure a defective warrant by pointing to an unincorporated, unattached document. See Groh, 540 U.S. at 557. Therefore, the court concludes that the June Warrants fail to meet the Fourth Amendment's requirement of particularity.

The August Warrant expressly incorporates Attachment A. See August Warrant, Attachment A (Doc. No. 89-2). However, the warrant fails to identify the specific offense for which the police established probable cause. While the warrant application lists the offenses for which the search warrant is sought, and the warrant application expressly incorporates Agent Mofenson's Affidavit, neither the warrant application nor the Affidavit are expressly incorporated on the face of the warrant. As noted above, see supra at 31, for a court to construe a warrant with reference to an outside document, the document must be both attached and expressly incorporated. Here, the August Warrant failed to use appropriate words of incorporation as to the application and as to the Affidavit.

Therefore, the court concludes that the August Warrant fails to meet the Fourth Amendment's requirement of particularity.

### 4. Overbreadth/Probable Cause

Despite their frequent conflation, "[over]breadth and particularity are related but distinct concepts. A warrant may be broad, in that it authorizes the government to search an identified location or object for a wide range of potentially relevant material, without violating the particularity requirement." United States v. Ulbricht, 858 F.3d 71, 102 (2d Cir. 2017). "The doctrine of overbreadth represents . . . an intersection point for probable cause and particularity." Wey, 256 F. Supp. 3d at 382. For example, an unparticularized description of the items subject to search under a warrant may result in the warrant exceeding the scope of established probable cause. See id. In other words, a warrant is overbroad if the description of items to be searched or seized is broader than the limits imposed by the probable cause justifying the warrant. Id.

In determining whether a warrant is overbroad, courts must focus on "whether there exists probable cause to support the breadth of the search that was authorized." Zemlyansky, 945 F. Supp. 2d at 464 (S.D.N.Y. 2013). "[P]robable cause to search is demonstrated where the totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place." Id. (citing Walczyk v. Rio, 496 F.3d 139, 156 (2d Cir.2007)). The magistrate judge's conclusion that probable cause exists is "entitled to great deference, and the task of the reviewing court is simply to ensure the magistrate [judge] had a substantial basis for that determination." Id.

Because the focus is on the magistrate judge's determination of probable cause, a reviewing court must look to the information before the magistrate judge at the time of

her decision. "A warrant permitting fairly broad types of materials is permitted if the affidavit in support of the search warrant application provides the necessary basis for a determination of probable cause to seize items in each of these categories." Id. Therefore, the court looks to whether Agent Mofenson's Affidavit and Attachment A, submitted with the applications for the June Warrants and August Warrant, support the breadth of the authorized searches. Because the evidence supporting probable cause to search each of the cell phones differs, the court examines each separately.

Attachment A[3] lists the items to be searched on each device. The government sought approval to search "all records contained in the Device[s]," including, inter alia: (1) "the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored" on the device; (2) any and all evidence showing or tending to show the identity of the maker or user of the data . . . such as passwords, sign-on codes, and program design; (3) "any and all records . . . which tend to demonstrate ownership and use of the device; and (4) "images and videos in the memory of the device." See Gov't's Post Hr'g Mem. Ex. 2.

As to Cell Phone 1, in brief, Agent Mofenson's Affidavit provided Magistrate Judge Margolis with the following evidence: (1) that an overdose victim had been in contact, via text message, with the operator of the Targeted Phone; (2) that the text messages contained what appeared to be agreements to purchase narcotics; (3) that the victim agreed with the operator to meet and purchase drugs on the date of the

---

[3] The Government submitted an "Attachment A" with each of the June warrant applications and with the August application. See Def. Ex. 1. The relevant text of each of these attachments is identical. See Mot. to Suppress (Doc. 49) at 59; Gov't Post Hr'g Mem. Ex. 2. Because the minor clerical differences between the documents are irrelevant to court's overbreadth analysis, the court refers to the attachments, collectively, as Attachment A.

victim's overdose; (4) that two individuals later identified the operator of the Targeted Phone as a drug dealer with a particular description, who drove a white Infiniti SUV near Elliot Street and Sylvan Avenue; (5) that surveillance officers observed an individual, later identified as Conley, who matched the physical description of the drug dealer, and who was driving a vehicle which matched the description provided; (6) that investigators saw Conley engage in what appeared to be a drug transaction; and (7) that, after officers stopped the Infiiti SUV and Special Agent Mofenson called the Targeted Phone, Special Agent Mofenson heard a phone ringing in the Infiniti SUV. In his Affidavit, Agent Mofenson also affirmed that, based on his experience, data on a cell phone, including contacts and text messages, internet browsing history, images and video, as well as location data, can contain evidence of narcotics distribution and that examining these categories of data could uncover evidence of who used a device, as well as evidence of co-conspirators the user of the device contacted. Because evidence of ownership and use of the device, as well as information regarding the identity of co-conspirators could reasonably be found in a broad range of data stored on a cell phone, the court concludes that the Magistrate Judge had a substantial basis upon which to find probable cause for the search of Cell Phone 1.

The strongest basis for a finding of probable cause as to Cell Phone 1 was that the phone rang when Special Agent Mofenson dialed the cell phone number both Frequent Callers had identified as the one used by the drug dealer D.L. That basis for probable cause did not apply to Cell Phone 3. However, the rest of Agent Mofenson's affirmations, including that a broad set of data on cell phones could be relevant to the ongoing investigation of narcotics offenses, applied with equal force. Based on the

facts sworn to in the Affidavit, including <u>inter alia</u> the corroboration of Frequent Caller 1 and Frequent Caller 2's description of the drug dealer named D.L.; that officers saw Conley engage in what they believed to be a drug transaction; the fact that all three phones were found together; and Agent Mofenson's affirmation, based on his training, that drug dealers often use multiple cell phones to further their trafficking activities, <u>see</u> Mot. to Suppress (Doc. No. 49) at 72, the court concludes that the Magistrate Judge had a substantial basis upon which to find probable cause to search Cell Phone 3.[4]

5.    Good-Faith Exception

In its Post Hearing Memorandum, the Government argued that even assuming that the June and August Warrants were overbroad or insufficiently particular, evidence obtained pursuant to the Warrants should not be suppressed because the good-faith exception applies.  <u>See</u> Gov't Post Hr'g Mem. at 6.  Here, the court has ruled that the June and August Warrants failed to meet the Fourth Amendments requirement of particularity, because they failed to note, either on their face or in explicitly incorporated documents, the crimes for which officers sought evidence.  <u>See</u> <u>supra</u> at 33.  However, not every violation of the Fourth Amendment warrants the exclusion of evidence.  Instead, application of the exclusionary rule depends on the "efficacy of the rule in deterring Fourth Amendment violations in the future as well as a determination that the benefits of deterrence outweigh the costs."  <u>United States v. Rosa, 626 F.3d 56, 64 (2d Cir. 2010)..</u> (citations omitted).  The exclusionary rule applies where officers "exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights."

_____

[4] The Motion to Suppress as to Cell Phone 2 is moot because the Government did not search Cell Phone 2.

United States v. Raymonda, 780 F.3d 105, 117–18 (2d Cir. 2015). "The pertinent analysis of deterrence and culpability is objective," and a court's "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." Rosa, 626 F.3d at 64 (citations and quotations omitted).

If a warrant has been invalidated, the good-faith exception to the exclusionary rule applies when an officer "genuinely believes that he has obtained a valid warrant from a magistrate judge and executes that warrant in good faith," as long as the officer's reliance on the warrant is "objectively reasonable." Raymonda, 780 F.3d at 118. The good-faith exception will not apply where an officer relies on a warrant in four circumstances:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

Id.

The Second Circuit has held that "a warrant not limited in scope to any crime at all is so unconstitutionally broad that no reasonably well-trained police officer could believe otherwise." United States v. George, 975 F.2d 72, 77 (2d Cir. 1992) (emphasis in original). George concerned a warrant to search the home of an individual suspected of a robbery; neither the warrant nor affidavit included any mention of the crime for which evidence was sought. Id. The Second Circuit concluded that the warrant was facially overbroad, and that the good-faith exception did not apply because no reasonable officer could believe that a warrant lacking indication of the crime for which evidence was sought could be valid. Id. at 77.

In United States v. Rosa, however, the Second Circuit reached a different conclusion. In Rosa, the Second Circuit analyzed the applicability of the good-faith exception to a warrant that did not "incorporate any supporting documents, or set forth the nature of the suspected criminal activity, " Rosa, 626 F.3d at 58, but where the unincorporated search warrant application included information about the crimes for which law enforcement sought evidence. Id. at 58–59. The materials presented to the judge in Rosa also included an unincorporated affidavit that provided the basis for the investigator's probable cause. See id. at 59. The same investigator who presented the search warrant application and affidavit to the judge performed an analysis of the seized files. See id. The court concluded that the examination of unincorporated documents was relevant to the "determination of whether the officers acted in good faith, because they contribute to our assessment of the officers' conduct in a particular case." Id. at 64. The Second Circuit then held that the good-faith exception applied because (1) the unincorporated documents made clear the purpose of the search; and (2) "as both the affiant and the officer in charge of executing the search warrant and later searching the digital media seized, [the investigator] was intimately familiar with the contemplated limits of the search." Id. at 65.

As the court has noted, the June and August Warrants failed to note the crimes for which officers sought evidence, violating the Fourth Amendment's particularity requirement. See supra at 33. However, the facts of this case are more akin to Rosa than to George. Agent Mofenson, like the investigator in Rosa, was "both the affiant and the officer in charge of . . . later searching the digital media seized." Id. The applications for both the June Warrants and August Warrant list the alleged violations

related to the searches, and both sets of applications refer readers to Agent Mofenson's Affidavit. The Affidavit clearly states that Agent Mofenson sought to search Phones 1, 2, and 3 for evidence "relating to the unlawful distribution, and the possession with intent to distribute, narcotics . . . ." <u>See</u> Mot. to Suppress Ex. C; Gov't Post Hr'g Mem. Ex. 2. Moreover, the Government has represented to this court through its filings, and Agent Mofenson has sworn in his statements submitted to this court, that his searches of the devices were "limited to the crimes under investigation." <u>See</u> Gov't Post Hr'g Mem. at 8.

While the Government's conduct in this case is problematic, the court concludes that the errors were due to "isolated negligence," as opposed to systemic or deliberate failures to adhere to the Fourth Amendment's requirements. The court concludes that, given the circumstances, the officers in this case acted reasonably and that application of the exclusionary rule would serve little deterrent purpose.[5] Accordingly, Conley's Motion to Suppress on this ground is denied.

---

[5] The court concludes that the Warrants were not overbroad. <u>See</u> <u>supra</u> at 34–37. However, even assuming <u>arguendo</u> the Warrants were overbroad, the good-faith exception would apply. Ultimately, it is the magistrate judge's responsibility to determine whether a warrant comports with the requirements of the Fourth Amendment. <u>See United States v. Leon</u>, 468 U.S. 897, 921 (1984). "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination . . . ." <u>Id.</u> "[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law. Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." <u>Id.</u> (internal quotation and citation omitted).

For the foregoing reasons, Conley's Motion to Suppress is **DENIED**, and his Supplemental Motion to Suppress is **DENIED.**

**SO ORDERED.**

Dated at New Haven, Connecticut this 20th day of September, 2018.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge